We find no error in the judgment appealed from and it is

Affirmed.

<hr/>

(72 South. 467)

No. 21709.

### Succession of PERCIVAL.

(June 30, 1916.)

*(Syllabus by the Court.)*

PHYSICIANS AND SURGEONS ⚬�longdash23—COMPENSATION—AMOUNT.

A physician has the right, in the absence of a custom of his own, to charge for his visits, by day or night, at least the fee sanctioned by the custom of the community in which he lives; nor is he obliged, in so doing, to rate himself below the class to which, in his opinion, he properly belongs; and, in such case, the burden rests upon the patient, who refuses to pay, to show a better reason for such refusal than that the physician is comparatively fresh from the seats of learning.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 52; Dec. Dig. ⚬�longdash23.]

Appeal from Civil District Court, Parish of Orleans; F. D. King, Judge.

In the matter of the succession of Mary Percival. Dr. John T. O'Ferrell filed an objection to the executor's account, disallowing his claim for medical services. From a judgment sustaining the objection in part, the opponent appeals. Modified and affirmed.

See, also, 137 La. 203, 68 South. 409; 138 La. 543, 70 South. 505.

John Dymond, Jr., and A. Giffen Levy, both of New Orleans, for appellant. Carleton Hunt and M. D. Dimitry, both of New Orleans, for appellee.

MONROE, C. J. The decedent appears to have had no forced heirs and to have died unmarried. She left an estate which was appraised at $264,056.33, of which she bequeathed property valued at $150,000 to the church of which she was a member, and the balance to various legatees. Succession of Percival, 137 La. 203, 68 South. 409. For some time prior to April 20, 1914, she had been attended, professionally, by an eminent neurologist; but, not being altogether satisfied with his treatment, she requested Dr. John T. O'Ferrell to take charge of her case, and requested a friend, who had been her legal adviser, to inform the attending physician of her wishes, which request having been complied with, the visits of the attending physician ceased, and Dr. O'Ferrell took charge, on the date above mentioned, and continued in charge until June 20, 1914, when the patient died. Thereafter Dr. O'Ferrell presented a bill of $1,500 for his services, which the dative executor declined to acknowledge, and the doctor thereupon filed an opposition to the executor's account, which opposition the trial judge sustained to the extent of allowing the opponent $262, and, from that judgment, the opponent prosecutes this appeal.

It appears from the evidence that opponent, as a boy, had been a member of dece-dent's Sunday school class, and that she had been, and continued to be, much attached to him; that, at a later period, he had become a doctor of medicine, had spent much of his time elsewhere than in New Orleans, and had but recently returned to the city when decedent employed him. He testified, without contradiction, that he was graduated from the Medical Department of Tulane University of Louisiana, in 1908; that he attended the Army Medical School in Washington City, from which he was graduated in 1909; after which he paid a short visit to New Orleans, and then served four or five months in Bellevue Hospital, in New York; that he then returned here and served five or six months as the assistant of Dr. Van Wart of this city, and then went to Wisner, Miss., where he was engaged in the general practice of his profession for two years and a half, with the idea, however, of specializing in orthopedics; that he went from Wisner to Boston, Mass., where he entered the Massachusetts General Hospital, in which he remained for a year, when he was graduated from the Orthopedic Department; and that he then spent four months visiting the important orthopedic clinics in Italy, Germany, France, and England, following which he returned to this country, and came to New Orleans in April, 1914. When first spoken to by the decedent upon the subject of his employment, opponent expressed some hesitation about accepting it, because, as he states, the case appeared to be on the "border line," and it was not altogether clear that it fell within the limits of his specialty. Beyond that, there was some friendly discussion upon the subject of his compensation, he expressing his objection to making any charge against his old friend, and she insisting that he should make the same charge as against any other patient, otherwise she would be unable to accept his services, and requesting that he take her case in

hand and endeavor to discover the nature of her trouble, and, if it proved to be not within his specialty, that he see to it that she obtained necessary medical treatment; and he took the case with that understanding and treated it, exclusively and most assiduously, from April 20 to May 22, 1914, during which period he made two or three visits a day, varying in length from half an hour to several hours, made a number of mechanical appliances, known as "Thomas Collars," which afforded his patient considerable relief, took a blood test, accompanied his patient to see an X-ray specialist, and, generally, devoted himself to the case. Being then unable to determine whether the disease was orthopedic or neurological, or both, he advised that Dr. Hummell, another eminent neurologist, be called, and, his advice having been accepted, Dr. Hummell began his treatment on May 22d and continued it until, say, June 9th, when he and opponent, in consultation, agreed that it would be advisable to call a surgeon, in order that an operation might be performed for the relief of some trouble, or supposed trouble, with the brain, and, the surgeon having been summoned and having recommended that the patient be removed to the Touro Infirmary, opponent made the necessary arrangements therefor, and she was taken to that institution on June 10th, after which the surgeon removed portions of her skull, by two operations, performed with an interval of about a week between them, and, on June 20th, after the second operation, the patient died, and then followed an autopsy which left still in doubt the question whether the disease with which she was afflicted was orthopedic or neurological, or otherwise, in its origin. It had been originally diagnosed as spasmodic torticolis (otherwise stiff, or wry, neck) and treated accordingly. Dr. Hummell gives the following testimony on that subject, and some others, to wit:

"In the beginning, I thought it was spasmodic torticolis. I had no means of determining otherwise, and the conditions expressed themselves that way; but, in speaking of the case, later, to Dr. O'Ferrell, we both admitted that there were unusual features about the case, but that was tentative only.

"Q. Spasmodic torticolis is a complication, or disease, that would naturally follow under Dr. O'Ferrell's specialty?

"A. It might, because spasmodic torticolis is a sympathetic affair, and several things may cause it. Some disease of the bone at the base of the neck might cause it. Some disease of the articular process of the cervicle vertebræ might cause it.

"Q. As I understand it, this was a complicated case, and could be classed as a border line case, which might be treated by an orthopedist or by a neurologist?

"A. I have just made a statement to that effect that the orthopedic condition might underlie the torticolic condition; I did not know that I would say otherwise."

The doctor had previously testified as follows:

"Q. Do you know what Miss Percival died from?

"A. We assigned the cause of her death as tubercular meningitis, after a post mortem.

"Q. That was the finding of the autopsy?

"A. Miss Percival's case was most extraordinary in every step. Even the post mortem did not exactly clear away every doubt in the case. The post mortem showed that she had a subacute meningitis, but a microscopic examination of the spinal bacilli did not show any bacilli which would be expected under such conditions. However, in certain instances, tubercular meningitis shows tubercular bacilli; but, frequently, that is" (not) "the case in real tubercular meningitis, considering the chronic symptoms in the latter stages of the case and the naked eye appearance. At the post mortem, I, myself, assisted. It was found that tubercular meningitis was the cause of death. I thought that the most probable cause, without being able to confirm it conclusively."

We are not sure that the learned doctor has been accurately reported, and have inserted the word "not" (in the parenthesis) at a venture; but the excerpt is, at least, sufficiently intelligible to show that the cause of death was not conclusively established, and hence that the time never arrived when the opponent, or any one else, was able to say that the case was not within the limits of opponent's specialty, or, still less, that opponent had been discharged, whether by the calling of the neurologist or the surgeon,

of his obligation to see that his patient obtained all necessary medical treatment.

Dr. Matas, the distinguished surgeon in the case, testified, in part, as follows, concerning the services rendered by him and opponent's relation thereto, to wit:

"I looked upon that as a critical operation. It was done under desperate circumstances, in order to see if it was possible to restore the patient. I will state that I first saw Miss Percival on June 9th, then on June 10th, from that date, continually, several times during the day and at night, by myself or in consultation with Drs. Hummell and O'Ferrell, until June 20th" —on which last-mentioned date, she died.

It was not to have been expected that opponent, after calling in Dr. Hummell, would have continued actually to have treated the case whilst Dr. Hummell was in immediate charge of it. Hence his visits were, no doubt, less frequent during that period than before, but he still bore the responsibility that he had assumed, and kept himself so informed in regard to the condition of the patient as to be able to advise with Dr. Hummell concerning the employment of Dr. Matas, after which both he and Dr. Hummell continued their visits and consulted with Dr. Matas until the end; the visits paid by them to the patient, after her removal to the infirmary, having been very numerous, and both of them having devoted practically the two entire days upon which the operations were performed to that service. The bill of Dr. Hummell, amounting to $1,875, and that of Dr. Matas amounting to $1,250, were paid without objection. Our learned brother of the district court found the testimony as to the number of visits paid by the opponent to be unsatisfactory, and reached the conclusion that opponent was entitled to nothing for his services, rendered after the employment of Dr. Hummell; his view being that the case was then turned over to Dr. Hummell and that the services subsequently rendered were friendly, merely, for which it was understood that no charge would be made. We agree with our learned brother that the testimony as to the number of visits paid by opponent is unsatisfactory, but, in our view, opponent was employed to find out what was the matter with decedent, and to treat her disease, himself, if it proved to be within the range of his specialty; otherwise, to secure for her competent treatment by other specialists, or general practitioners, and his obligation required his attention during the life of the patient, and was faithfully discharged. It is true there was some testimony to the effect that opponent had stated to Mr. Chambers that it was not his intention to make any charge at all, and that the decedent, after the employment of Dr. Hummell, requested him to continue to call upon her, as a friend; but the original employment of opponent, upon a business basis, is proved beyond dispute, and the testimony to which we have thus referred, and which is at variance with his understanding of the situation, fails to satisfy us that any change was made in the conditions upon which he was originally employed. Our learned brother was also of opinion that a young practitioner has no right to charge, or expect to be paid, the fees charged by those who are older and whose reputations have been established, and hence he allowed opponent but $3 each, for day visits, and $6 for night visits, although, according to the evidence, the customary charges, by specialists, appear to be $5 and $10, respectively. It may happen, however, that the knowledge of the schools goes beyond that upon which reputations have been founded, and that the later graduate, bringing with his diploma, the latest discoveries, is more competent to deal with a particular case than the earlier, with the experience of a past generation. However that may be, any physician has the right, in the absence of a custom of his own, to charge for his visits, day or night, at least the fee sanctioned by the custom of the community

in which he lives; nor is he obliged, in so doing, to rate himself below the class to which, in his opinion, he properly belongs; and, in such a case, the burden rests upon the patient, who refuses to pay, to show a better reason for such refusal than that the physician is comparatively fresh from the seats of learning. It is therefore ordered that the judgment appealed from be amended by increasing the amount to be allowed to the opponent to $1,500, and, as thus amended, affirmed, at the cost of the succession.